UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LEVINE, ET AL.,

          Plaintiffs,

  v.

CHUCK CONNER, Acting Secretary, United States Department of Agriculture,

          Defendant.

No. C 05-04764 MHP

**OPINION**

**Re: Cross-Motions for Summary Judgment**

    Plaintiffs are: 1) poultry eaters concerned about food-borne illnesses; and 2) organizations representing poultry slaughterhouse workers concerned about working conditions. On November 21, 2005 plaintiffs filed the instant case against the United States Department of Agriculture ("USDA") challenging the USDA's interpretive rule excluding chickens, turkeys and other poultry species from the Humane Methods Slaughter Act ("HMSA") of 1958, 7 U.S.C. §§ 1901 et seq. Now before the court are the parties' cross-motions for summary judgment. The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

BACKGROUND

    In 1958, Congress enacted the HMSA with the goal of "prevent[ing] needless suffering" of animals killed for food and because humanitarian killing "results in safer and better working conditions for persons engaged in the slaughtering industry . . . and produces other benefits for producers, processors, and consumers." 7 U.S.C. § 1901. The Act establishes that it is "the policy of the United States that the slaughtering of livestock and the handling of livestock in connection

with slaughter shall be carried out only by humane methods." Id. The Act found that with respect to "cattle, calves, horses, mules, sheep, swine, and other livestock" a method that renders them "insensible to pain by a single blow or gunshot or an electrical, chemical or other means that is rapid and effective, before being shackled, hoisted, thrown, cast, or cut" is humane. Id. § 1902(a). The HMSA then directed the Secretary of the USDA (the "Secretary") to intermittently designate humane methods of slaughter, with reference to other existing methods and then-current scientific knowledge, for each species of livestock. Id. § 1904(b). In 1959, pursuant to Congress' directive, the Secretary prescribed humane methods of slaughter for cattle, calves, horses, mules, sheep, swine, and goats. Designation of Methods, 24 Fed. Reg. 1549–53 (Mar. 3, 1959).

In 1978, Congress amended the Federal Meat Inspection Act ("FMIA") of 1907, which covered "cattle, sheep, swine, goats, horses, mules, and other equines." 21 U.S.C. §§ 601 et seq. The 1978 amendment added a provision to the FMIA requiring the USDA to ensure that animals covered by the FMIA are also slaughtered in accordance with the HMSA of 1958. Pub. L. No. 95-445, 92 Stat. 1069 (Oct. 10, 1978). It concurrently repealed the HMSA's enforcement provisions and provided for criminal and civil penalties under the FMIA for slaughter conducted inhumanely. See id.; 21 U.S.C. § 676.

On September 28, 2005 the USDA's Food Safety and Inspection Service issued a notice entitled "Treatment of Live Poultry Before Slaughter." 70 Fed. Reg. 56,624 (Sept. 28, 2005) (hereinafter "Notice"). The Notice was in response to "considerable congressional and public interest in the humane treatment of animals, including poultry." Id. at 56,624. The notice reiterated that "there is no specific federal humane handling and slaughter statute for poultry" and stated that adherence to the agency's Poultry Products Inspection Act ("PPIA") promotes humane slaughter. Id.

Later in 2005, Congress amended the FMIA to replace all references to "cattle, sheep, swine, goats, horses, mules, and other equines" with "amenable species." Pub. L. No. 109-97, 119 Stat. 2120 (Nov. 10, 2005). The amendment defines "amenable species" to include cattle, sheep, swine, goats, horses, mules, and other equines, 21 U.S.C. § 601(w)(1), as well as "any additional species of

livestock that the Secretary considers appropriate," id. § 601(w)(2).

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

DISCUSSION

The Administrative Procedures Act ("APA") governs judicial review of administrative decisions. 5 U.S.C. § 706. Under the APA, a court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A). The Supreme Court has laid out a two-part test to determine whether an agency has acted "not in accordance with law." See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,

467 U.S. 837, 842–43 (1984). The court must first look to the statute's language to determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of matter; for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. The reading of the statute must be the "only plausible interpretation." Regions Hosp. v. Shalala, 522 U.S. 448, 460 (1998). "If, however, the court determines Congress has not directly addressed the precise question at issue . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843. If the construction is permissible, the court must defer to the agency, but the court need not defer to agency regulations "if [the agency] construe[s] a statute in a way that is contrary to congressional intent or that frustrates congressional policy." Akhtar v. Burzynski, 384 F.3d 1193, 1198 (9th Cir. 2004).

Plaintiffs argue that under Chevron step one, the USDA's interpretation excluding poultry from livestock violates the plain language of the HMSA since livestock, by definition, includes poultry. They then argue that the USDA's unexplained interpretive rule fails Chevron step two and this action must therefore be remanded to the USDA for a more cogent rationale. Defendant argues that the statute is unambiguous in its intent to exclude poultry. Alternatively, it argues that the USDA's interpretation of livestock is permissible. The court discusses each Chevron prong in turn.

I.  Unambiguous Congressional Intent

Under step one of the Chevron analysis, the court employs "traditional tools of statutory construction" to determine whether the meaning of a statute is unambiguous. Chevron, 467 U.S. at 843 n.9.

    A.  Plain Language

In determining whether a statute's language is unambiguous, words are to be given their "ordinary and natural meaning" and courts are to "follow the common practice of consulting dictionary definitions to clarify the [word's] ordinary meaning and look to how the terms were

4

defined at the time the statute of was adopted." United States v. TRW Rifle, 447 F.3d 686, 689 (9th Cir. 2006) (internal citations omitted). The court must first look to the language of the statute itself which, in this case, in prescribing the methods of "slaughter and handling" includes only "cattle, calves, horses, mules, sheep, swine, and other livestock." 7 U.S.C. § 1902(a). The terms "other livestock" or "livestock" are not defined in the Act.

Plaintiffs contend that when the HMSA was enacted, livestock was defined by one definitive source as "domestic animals used or raised on a farm – especially those kept for profit." Webster's Int'l Dictionary of the English Language 1446 (2d ed. 1957). There do not seem to be any dictionary definitions from the 1950's that explicitly include poultry as livestock.[1] Defendant's proffered definitions define livestock as a category of animals including "horses, cattle, sheep and other useful animals kept or raised on a firm or ranch." The American College Dictionary 713 (1957); see also Def.'s Motion for Summary Judgment at 11.[2] The precise metes and bounds of the category, however, are not given. The category of animals could thus be limited to a narrow group of quadrupeds like cattle and other bovine creatures or alternatively, it could be all-encompassing, as the plaintiffs contend. Indeed, the scope of domestic animals used or raised on a farm can potentially extend to guinea pigs, cats, dogs, fish, ants, and bees. Under plaintiffs' proffered definition, it is unclear which domestic animals are to be included if they are not kept for profit, and under defendant's definition above, it is unclear which farm animals are useful.

Defendant provides other sources that purportedly provide an exhaustive list of animals considered to be livestock, but which neglect to list poultry. See I. L. Mason, A World Dictionary of Breeds Types and Varieties of Livestock 9 (1951); Hilton M. Briggs, Modern Breeds of Livestock ix-x (1949); Henry W. Vaughn, Breeds of Live Stock in America 9–11 (1931). The preceding sources do not provide an explanation for their exclusion of poultry, but do provide a closed set definition that does not include poultry.[3] Nevertheless, these arcane sources are not enough to conclusively resolve the ambiguity created by general dictionary definitions of livestock.

Plaintiffs argue that common parlance dictates that livestock include poultry. The USDA itself has used the term livestock to include poultry. See Report on Changes in Farm Production and

1  Efficiency, USDA Statistical Bulletin No. 233 (August 1958) (report included information about
2  poultry when discussing livestock data).[4] Plaintiffs cite to the facts section of Robinson v. Solano
3  County, 278 F.3d 1007, 1010 (9th Cir. 2002), in which plaintiff raised "livestock including cattle,
4  ducks, turkeys, geese, and chickens." The flip side of this coin, however, is that other courts have
5  found the meaning of livestock to be uncertain, and have then construed livestock to exclude
6  poultry. See, e.g., State v. Nelson, 499 N.W.2d 512, 514 (Minn. Ct. App. 1993).

Furthermore, the fact that Congress frequently vacillates between treating livestock and poultry as distinct concepts informs this court's decision. Specifically, the terms are used distinctly in numerous chapters of Title VII of the United States Code, the same Title that includes the HMSA. See, e.g., 7 U.S.C. § 182(4) (Chapter 9, entitled Packers and Stockyards and enacted in 1921, defines livestock as "cattle, sheep, swine, horses, mules, or goats."). Numerous other chapters under Title VII do the same.[5] Congress, however, sometimes includes poultry under the definition of livestock. See 7 U.S.C. § 1523(b)(1) (the Federal Crop Insurance Act defines livestock to include "cattle, sheep, swine, goats, and poultry."). Numerous other chapters under Title VII do the same.[6] Since the term livestock includes poultry in some sections, but not in others, the term standing alone is necessarily ambiguous. See Robinson v. Shell Oil Co., 519 U.S. 337, 343–44 (1997). Nevertheless, this Congressional vacillation cuts in favor of excluding poultry from the definition of livestock because holding otherwise would render Congress' repeated uses of the term poultry in the same statutes as livestock superfluous—a construction which goes against accepted canons of statutory interpretation. See Boise Cascade Corp. v. Envtl. Prot. Agency, 942 F.2d 1427, 1432 (9th Cir. 1991).

In sum, the plain meaning of the word livestock is ambiguous. The court now turns to other indicators of Congressional intent to determine whether Congress intended to exclude poultry when it used the term livestock.

### B. Legislative History

The HMSA was not written on a clean slate. There is ample prior history of Congress acting

to protect the public from unsafe meat and poultry products. As early as 1907, Congress enacted the FMIA, 21 U.S.C. §§ 601 et seq., to regulate the production and distribution of meat and meat food products. This statute also included a provision for the examination and inspection of the slaughtering of livestock, which it described as pertaining to "cattle, sheep, swine, horses and mules, and other equines." 21 U.S.C. § 603(b). The statute makes no mention of poultry or any animals within the ordinary meaning of poultry. Id. §§ 601 et seq.

On August 28, 1957—exactly one year before the enactment of the HMSA—Congress enacted the PPIA, 21 U.S.C. §§ 451 et seq., to provide an elaborate system for the inspection, processing and regulation of poultry and poultry products. Poultry is defined as "any domesticated bird, whether live or dead." Id. In addition to prescribing sanitary procedures, labeling, inspection, distribution and a number of other practices, the PPIA provides in part: "[N]o person shall - (1) slaughter any poultry or process any poultry parts . . . except in compliance with the requirements of this chapter . . . ." Id. § 458(a). Section 464(a) of the PPIA, however, exempts certain slaughtering and processing from the statutory requirements. Although the PPIA is short on methods of slaughter, it is noteworthy that this comprehensive statute was adopted just one year before the HMSA. The enactment of the PPIA and the HMSA by the same Congress, the 85th, suggests that Congress understood there to be a distinction between livestock and poultry.

In 1967, Congress amended FMIA subsection 603(b), entitled "Humane Methods of Slaughter," to reference the "Act of August 27, 1958"—the HMSA—to ensure that methods of slaughter complied with the HMSA. A number of other provisions of the 1907 Act were amended in 1967 and 1978. The HMSA was also amended in 1978 by the same statute that amended the 1907 Act. See Pub. L. 95-445, 92 Stat. 1069 (Oct. 10, 1978). In none of these amendments is poultry mentioned.

The court also notes that when the 1907 Act and its 1967 and 1978 amendments refer to the product of livestock they use the term "meat." In contrast, the 1957 PPIA—which was also amended in 1978—does not use the term "meat" and refers only to "poultry products." Furthermore, in 1996, Congress amended both the FMIA and PPIA to add sections 679a and 471

7

respectively, which provided for the establishment of the "Safe Meat and Poultry Inspection Panel." Pub. L. 104-127, § 918(a)(1)(B), (a)(2), 110 Stat. 1188–90 (April 4, 1996). In yet another section of this 1996 enactment, relating to the regulation of commercial transportation of equine for slaughter, Congress states that the provision does not purport to regulate the transportation "to slaughter or elsewhere, of - (1) livestock other than equine; or (2) poultry." Id. at § 904, 110 Stat. 1185. Thus, once again, Congress distinguished between livestock and poultry. See also id. at Title IX, subtitle A, 110 Stat. 1184 (entitled "Commercial Transportation of Equine for Slaughter.").[7]

Congress also intended a limited definition for livestock because the HMSA, as originally enacted, did not include the PPIA, but did include the FMIA, which provided inspection authority for "cattle, sheep, swine, and goats" and "live horses." See Pub. L. 85-765, § 4(c), 72 Stat. 863 (Aug. 27, 1958); 59 Pub. L. 59-242, 34 Stat. 1256, 1259–60 (Mar. 4, 1907). The FMIA does not include all the animals Congress specifically listed in the HMSA. Thus, Congress could not have intended to limit the animals covered by the HMSA to be limited to those in the FMIA. However, since it was the same Congress that enacted the PPIA and the HMSA, it would behoove them to include the PPIA if they intended poultry to be included.[8]

Plaintiffs argue that the congressional debate surrounding the enactment of the HMSA demonstrates ambiguity. During the floor debate in the House of Representatives on H.R. 8308—the bill that eventually became the HMSA—Representative Hoffman read into the record the above quoted Webster's dictionary definition and then declared, "[n]ow, chickens and turkeys are livestock." 104 Cong. Rec. H1659 (daily ed. Feb. 4, 1958). To the contrary, the author of the bill, Representative Poage, stated that "[c]hickens are not livestock under the terms of this bill." Id. at H1655. Though neither of the statements demonstrates the intent of the legislature as a whole, the court affords greater weight to the statements made by the author of the bill than those of other representatives. See Fed. Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 564 (1974).

The belief that the bill did not apply to poultry was reflected by some Senate members as well. For instance, Senator Hickenlooper stated that H.R. 8308 "apparently does not touch the killing or market preparation of fowl of various kinds." Humane Slaughtering of Livestock:

Hearings Before the Sen. Comm. on Agr. and Forestry, 85th Cong. 243 (1958). The Assistant Secretary of Agriculture replied that "[he] believe[s] not." Id. (statement of Mr. Peterson). During the floor debate, however, some Senate members believed otherwise. When Senator Young asked "[w]hy does not the bill apply to poultry?," Senator Humphrey, a member of the Agriculture Committee, replied that "[i]t can, under section 4, if the Secretary of Agriculture so designates." 104 Cong. Rec. S15,376 (daily ed. July 29, 1958). When asked why the bill was not more precise, Senator Humphrey replied, "[W]e do not go that far. This is a peculiar situation. The proponents of what I call an effective bill are accused, on the one hand, of going too far, and, on the other hand, of not going far enough. The bill is a mild and modest beginning in the field of humane slaughter."[9] Id. The Senate eventually passed a bill substantially similar to the House Resolution even though they had concurrently discussed a study bill that deemed livestock to include poultry. Id. at S15368. These statements by individual senators are not conclusive; however, the Senate's concurrent rejection of a bill that explicitly defined livestock to include poultry suggests that livestock, standing alone, did not include poultry.

Indeed, the HMSA only refers to enumerated animals and other livestock even though when Congress was discussing this matter, they concurrently discussed eight separate bills, one of which explicitly distinguished between livestock and poultry. See H.R. 6509, 85th Cong. (1st Sess. 1957); S. 1497, 85th Cong. (1st Sess. 1957) (both defining livestock and poultry separately). The other bills concurrently discussed also make a distinction between poultry and livestock. See H.R. 176, 85th Cong. (1st Sess. 1957); H.R. 2880, 85th Cong. (1st Sess. 1957); H.R. 3029, 85th Cong. (1st Sess. 1957); H.R. 3049, 85th Cong. (1st Sess. 1957); H.R. 5671, 85th Cong. (1st Sess. 1957); H.R. 6422, 85th Cong. (1st Sess. 1957) (all covering animals "susceptible of use for the preparation of meat or meat products" but all also distinguishing between poultry products and meat products). In sum, Congress distinguished between livestock and poultry amongst the many bills it considered, but ultimately decided on a bill that included livestock only. See Immigration & Naturalization Serv. v. Cardoza-Fonseca, 480 U.S. 421, 442–43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend sub silento to enact statutory

9

1  language that it has earlier discarded in favor of other language.") (internal quotations omitted). The
2  plain language of these bills indicates that Congress intended to exclude poultry from the definition
3  of livestock when it enacted H.R. 8308, the bill that eventually became the HMSA.

Finally, plaintiffs argue that poultry was intended to be included because the advisory committee created in conjunction with passage of the HMSA included a representative from the poultry industry. Pub. L. No. 85-765, § 5, 72 Stat. 863 (Aug. 27, 1958). The inclusion of the poultry representative, however, was in addition to two representatives from the "livestock" industry. This argument cuts against plaintiffs as it demonstrates that Congress intended a distinction between poultry and livestock. The inclusion of the poultry representative could have been because there had been discussion of the HMSA applying to poultry. See 104 Cong. Rec. H1655 (daily ed. Feb. 4, 1958) (statement of Rep. Poage). Indeed, a more persuasive reason for the presence of a member of the poultry industry on the committee may have been the industry's interest in protecting itself from regulation by the Act, particularly since it had been the subject of statutory regulation under the PPIA during the preceding year.

The court thus finds the legislative history strongly demonstrates unambiguous Congressional intent that livestock, as used in the HMSA, does not include poultry. Nevertheless, the court analyzes certain canons of statutory construction in order to ensure the Congressional intent found above has not been negated.

### C. Canons of Statutory Construction

Defendant argues that the traditional canons of *noscitur a sociis* and *ejusdem generis* apply to this situation because the term "other livestock" follows a list of enumerated animals. The former canon provides that when a word is ambiguous, its meaning may be determined by reference to the rest of the statute. The latter provides that where general words follow an enumeration of specific items, the general words are read as applying to other items akin to those specifically enumerated. See Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 384 (2003). These canons lend support to defendant's argument that Congress intended to limit

livestock to "other quadrupeds traditionally considered to be livestock." See, e.g., McBoyle v. United States, 283 U.S. 25 (1931) (holding that "any other self-propelled vehicle," when preceded by "automobile, automobile truck, automobile wagon, and motorcycle" did not include aircraft).

Defendant's categorical and self-referential definition, however, is not unique. Other categorical descriptions that take into account all of the unifying characteristics of the enumerated animals also exist. For example, the canons also provide evidence that Congress meant to include animals that are kept or raised on a farm. Thus, the unifying characteristic may be quadrupeds or animals raised on a farm. In this respect, this case is distinguishable from James v. United States, 127 S. Ct. 1586, 1592 (2007), where the list "burglary, arson, or extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another" did not evidence an intent to limit the residual clause to completed offenses only. As the Supreme Court held, the unifying characteristic, as repeated in the residual provision, was those acts that "create significant risks of bodily injury or confrontation that might result in bodily injury." Id. In contrast, a broad definition for the residual phrase here has the potential to render the enumerated animals superfluous whereas a narrow definition has the potential to render the residual phrase superfluous. Despite plaintiffs' contentions, Congress has provided no evidence that the former is the preferred reading.

Plaintiffs claim that when specific terms conclude with the phrase "or other," Congress "intended the [list and the 'other' term] to mean two separate things." United States v. 144,774 Pounds of Blue King Crab, 410 F.3d 1131, 1135 (9th Cir. 2005). This argument too, cuts both ways. The list enumerated by Congress was clearly meant to be partial and illustrative, see Haviland v. Butz, 543 F.2d 169, 174 (D.C. Cir. 1976), but since the USDA has already concluded that livestock includes goats—an animal not listed in the statute—this argument does not support plaintiffs' position that poultry ought to be included as well. The enumerated list and the "other livestock" language already mean two separate things.

Plaintiffs further argue that the USDA has only included goats under the definition of "other livestock" and that if only goats were meant to be included, then the statute would have simply listed

goats.  This argument proves too much.  If the USDA had designated two non-enumerated animals as livestock, then plaintiffs would have argued that Congress could just as easily have listed two more animals instead of using the catch-all phrase.  The same argument could be used if the USDA designated ten non-enumerated animals.  Plaintiffs do not present any cogent argument as to why listing only one non-enumerated animal is not enough.  Listing goats certainly eliminates the possibility that certain parts of the statute are not being given effect.  Furthermore, the USDA's definition of livestock is malleable.  Congress explicitly gave the USDA authority to regularly designate methods of humane slaughter for livestock.  7 U.S.C. § 1904(b).  The USDA may therefore add to the list of "other livestock" as it sees fit.  Indeed, that is exactly what plaintiffs desire.  Even if the court was to agree that Congress intended to have "other livestock" include more than just goats, plaintiffs' argument does not demonstrate how inclusion of poultry is compelled.

On balance, these canons do not negate the Congressional intent found above.

II.     Permissible Agency Interpretation

The court finds that Congress intended to exclude poultry from the categorical word "livestock." Accordingly, the court need not address the second prong of Chevron.

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED and plaintiffs' motion for summary judgment is DENIED.

IT IS SO ORDERED.

Dated: February 28, 2008

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

ENDNOTES

1. Plaintiffs cite to dictionary definitions from the twenty-first century that include poultry in the definition of livestock. Dictionary definitions, however, change over time. Compare Black's Law Dictionary 1083 (4th ed. 1951) (defining livestock as "[d]omestic animals used or raised on a farm") with Black's Law Dictionary 953 (8th ed. 2004) (defining livestock as "[d]omestic animals and fowls that are kept for profit or pleasure").

2. Defendant references other dictionaries that provide categorical definitions as well. See, e.g., Grosset Webster Dictionary 352 (1957); Black's Law Dictionary (4th ed. 1951).

3. Contrary to defendant's assertion, this situation is unlike a book on musicians neglecting to discuss Miles Davis. An appropriate parallel would be a book purporting to discuss all the great jazz musicians neglecting to discuss Miles Davis. Miles Davis would still nevertheless be a musician, just not a great jazz musician according to the book's author. Similarly, a book on livestock neglecting to mention poultry may mean that the book's author does not consider poultry to be livestock, but does not mean that poultry, e.g. chickens, are not animals.

4. Plaintiffs claim that the USDA's interpretation excludes 98% of animals slaughtered, which violates the broad mandates of the HMSA. This statistic undercuts plaintiffs' argument because the court is unconvinced that Congress would decline to explicitly list the vast majority of the beneficiaries of a statute when specifically listing some beneficiaries.

5. See, e.g., 7 U.S.C. §§ 451; 608c(2); 1301(b)(5), (6)(A); 1942(a)(2); 2132(g); 2274; 3154(b)(2); 6982(a)(4); 7412(1)(B), (C); 7627(b)(3); 7702(10); 8320(a)(4)(A), (B)(i).

6. See, e.g., 7 U.S.C. §§ 1631(c)(5); 8302(10); 1471(2); 6502(11); 5602(1).

7. Plaintiffs contend that the longstanding USDA interpretation is of no consequence since "Congressional acquiescence can only be inferred when there is 'overwhelming evidence' that Congress explicitly considered the 'precise issue' presented to the court." Morales-Izquierdo v. Gonzales, 486 F.3d 484, 493 (9th Cir. 2007) (citations omitted). Here, however, there is ample evidence that Congress considers poultry and livestock to be distinct concepts.

8. Defendant argues that without an inspection and identification process with respect to poultry, the USDA would not have been able to ensure compliance. This argument falls flat because Congress amended the FMIA in 1978 to provide for civil and criminal penalties for non-compliance regarding animals covered by the HMSA.

9. Defendant claims an expansive interpretation would ignore that the HMSA sought to "strike a middle course between a number of essentially irreconcilable points of view and, therefore, like most compromises, is probably not entirely satisfactory to any of the protagonists in this matter." H.R. Rep. No. 85-706, at 1 (1957). This argument is unpersuasive as the compromise could just as easily have included poultry or excluded poultry from the definition of livestock.

13